## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SERGIO BONILLA, JOHN BRAUNDMEIER, and KEVIN WALLACE, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No: 1:20-cv-07390 |
| | Hon. Virginia M. Kendall |
| v. | |
| ANCESTRY.COM OPERATIONS INC., a Virginia Corporation; ANCESTRY.COM INC., a Delaware Corporation; ANCESTRY.COM LLC, a Delaware Limited Liability Company; and DOES 1 through 50, inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATION OF 765 ILCS 1075/1 *et seq.* AND UNJUST ENRICHMENT

Plaintiffs SERGIO BONILLA, JOHN BRAUNDMEIER, and KEVIN WALLACE, by and through their attorneys, make the following allegations on information and belief, except as to factual allegations pertaining to Plaintiffs, which are based on personal knowledge, and allegations pertaining to Ancestry's use of Mr. Braundmeier's and Mr. Wallace's childhood photographs on the website ancestry.com, which are based on information Ancestry's counsel provided to Plaintiffs' counsel.

## INTRODUCTION

1.      Plaintiffs bring this class action complaint against ANCESTRY.COM OPERATIONS INC.; ANCESTRY.COM INC; ANCESTRY.COM LLC; and DOES 1-50 (collectively, "Ancestry") for knowingly misappropriating the photographs, likenesses, names, and identities of Plaintiffs and the class; knowingly using those photographs, likenesses, names,

and identities for the commercial purpose of selling access to them in Ancestry products and services; and knowingly using those photographs, likenesses, names, and identities to advertise, sell, and solicit purchases of Ancestry services and products; without obtaining prior consent from Plaintiffs and the class.

2.      Ancestry's business model relies on amassing huge databases of personal information, including names, photographs, addresses, places of birth, estimated ages, schools attended, and other biological information, then selling access to that information for subscription fees. Ancestry's databases comprise billions of records belonging to hundreds of millions of Americans. The main subject of this lawsuit is Ancestry's "U.S., School Yearbooks, 1900-1999" database ("Ancestry Yearbook Database"). The Ancestry Yearbook Database includes the names, photographs, cities of residence, and schools attended of many millions of Americans. According to the Ancestry website, the Ancestry Yearbook Database includes over 47 million individual records from Illinois schools and universities.

3.      Ancestry acquired most of the photographs in its Yearbook Database by paying licensing fees to PeopleConnect, Inc, which owns and operates the website www.classmates.com.

4.      Ancestry has not received consent from, given notice to, or provided compensation to the millions of Illinoisans whose names, photographs, biographical information, and identities appear in its Ancestry Yearbook Database.

5.      The names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities contained in the Ancestry Yearbook Database uniquely identify specific individuals.

6.      Ancestry uses the names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities in its Ancestry Yearbook Database on and in its products

2

and services. Ancestry sells access to those records to paying subscribers. In exchange for subscription payments ranging from $24.99 to $49.99 per month, depending on the plan, Ancestry subscribers receive the ability to search, view, and download records in Ancestry databases, including the names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities Ancestry has amassed in its Ancestry Yearbook Database without consent.

7.      Ancestry uses the names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities in its Ancestry Yearbook Database to advertise and promote its monthly subscription products and services, including its "U.S. Discovery," "World Explorer," and "All Access" subscription plans.

8.      Ancestry advertises and promotes its products and services to new subscribers by offering a 14-day promotional "free trial" that provides temporary access to search, view, and download records from Ancestry's databases. Users who sign up for the promotional "free trial" provide payment information but are not billed until the promotional "free trial" expires and may cancel before the trial expires without charge. During the promotional "free trial," users are encouraged to search Ancestry Databases, including its Yearbook Database, for the names of any people they may know or be curious about. In response to searches of the Ancestry Yearbook Database, users receive a list records, each of which corresponds to a specific identifiable person, and includes the individual's name, yearbook photo, estimated age, city of residence, school attended, and year of attendance. "Free trial" users may view and download full-resolution versions of yearbook photos of the individuals they have searched.

9.      The sole purpose of offering the promotional "free trial" is to induce users to subscribe to its paid product and service. By providing access to and encouraging use of its Ancestry Yearbook Database as part of its promotional "free trial," Ancestry is using the identities

of Plaintiffs and the class for the commercial purpose of advertising and promoting the purchase of its subscription products and services.

10.    Ancestry also advertises and promotes its monthly subscription products and services by providing a promotional limited-access version of its website. Any visitor to the Ancestry website may access the promotional limited-access version, even if they have not provided contact information or signed up for the promotional "free trial." Users on the promotional limited-access version are encouraged to search Ancestry Databases, including its Yearbook Database, for the names of any people they may know or be curious about. In response to searches of the Ancestry Yearbook Database, users receive a list records, each of which corresponds to a specific identifiable person, and includes the individual's name, city of residence, and a low-resolution version of a yearbook photo. Users of the promotional limited-access version of the website may view the low-resolution photo, allowing them to confirm the record corresponds to the person they are searching for. Users cannot view the full-resolution version of the photograph or view additional information about the person such as estimated age, name of school, and yearbook year. If users click to view this information, they are encouraged to "sign up now" for a paid subscription.

11.    The sole purpose of offering the promotional limited-access version of the website is to induce users to subscribe to its paid product and service. By providing access to and encouraging use of its Ancestry Yearbook Database as part of its promotional limited-access website for non-subscribers, Ancestry is using the identities of Plaintiffs and the class to advertise and promote its subscription products and services.

12.    Ancestry also advertises by sending promotional emails to users who have signed up for a free account but have not yet signed up for a paid subscription. Some of those promotional

emails contain "hints" corresponding to yearbook records of people Ancestry believes the recipient may be related to. The "hint" emails display the full name and estimated birth year of the individual. Clicking on either the individual's name or on the button labelled "See your hint" brings the recipient directly to a web page soliciting a six-month subscription to Ancestry.com for $99.00. If the recipient agrees to pay Ancestry, they may view the record corresponding to the name and likeness Ancestry sent in the "hint" email, including the individual's photograph. Ancestry appropriated and continues to grow its massive databases of personal information, including its Ancestry Yearbook Database, which contains the names, photographs, cities of residence, schools attended, estimated ages, likenesses, and identities of millions of Illinoisans. Ancestry uses these records both as the core element of its products and services, and to sell and advertise its products and services, without providing any notice to the human beings who are its subjects. Ancestry did not ask the consent of the people whose personal information and photographs it profits from. Nor has it offered them any compensation for the ongoing use of their names, photographs, likenesses, and identities as part of its products and services, and to sell and advertise its products and services.

13.     Through its actions, Ancestry has harmed and continues to harm Plaintiffs and the class by denying them the economic value of their likenesses, violating their legally protected rights to the exclusive use of their likenesses, and violating their right to seclusion. Ancestry has also earned ill-gotten profits and been unjustly enriched.

14.     These practices, as further detailed in this complaint, violate the Illinois right to publicity as codified in 765 ILCS 1075/1 *et seq.*; and Illinois common law protecting against Unjust Enrichment.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act ("CAFA")), because: (A) all members of the putative class are citizens of a state different from any defendant. According to available public records, Defendants are all incorporated in either Delaware or Virginia, and are headquartered in Utah. The class members are residents of Illinois. (B) The proposed class consists of at least 100 members. Ancestry advertises that its Ancestry Yearbook Database comprises about 730 million individual records collected from "more than 450,000 yearbooks and more than 62 million pages." A search of the database for records located in "Illinois, USA" returns more than 47 million individual records. Even accounting for the fact that some individuals may appear in multiple records, that some are deceased or no longer live in Illinois while others have moved into the state, and that the class excludes current Ancestry subscribers, the class likely comprises millions of Illinoisans. And (C) the amount in controversy exceeds $5,000,000 exclusive of interest and costs. 765 ILCS 1075/1 *et seq.* provides for damages equal to the greater of $1,000 per violation or the actual damages suffered by Plaintiffs, plus exemplary and/or punitive damages in the case of knowing use without consent. Given more than 47 million individual records in Illinois, the amount in controversy is well over the jurisdictional amount.

16.     This Court has personal jurisdiction over the claims of Plaintiffs and the non-named class members. Ancestry maintains substantial connections to the state of Illinois, and those connections are closely entwined with the wrongdoing in this case.

17.     Ancestry regularly collects records from the state of Illinois, often by sending staff or hired representatives to various locations in Illinois where the physical records are maintained.

Ancestry staff or hired representatives then scan and digitize the records on-site.[1] Records collected by Ancestry include Illinois yearbooks, Illinois marriage records, Illinois birth records, Illinois census returns, and Illinois voter lists. Ancestry has already amassed tens of millions of records concerning Illinois residents and is continually adding more to its database.

18.     With respect to the yearbooks at the center of this lawsuit, to date Ancestry has acquired forty-seven million individual records from yearbooks at Illinois high schools and Universities.

19.     Ancestry acquired most of the photographs in its Yearbook database by paying licensing fees to PeopleConnect, Inc., in exchange for digitized yearbook photographs and the right to make use of those photographs in promoting Ancestry.com subscriptions. Upon information and belief, the terms of Ancestry's agreement with PeopleConnect, Inc. include the grant of a license that purports to give Ancestry the right to make commercial use of Plaintiffs' and class members' photographs (1) in its products; (2) to promote its products by offering searchable free trial access to the photographs; and (3) to promote its products by including the photographs in "hint" emails.

20.     Upon information and belief, Ancestry has sent staff or hired representatives to the state of Illinois to copy and digitize yearbooks on-site at Illinois libraries, local government

---

[1] *See* https://www.buzzfeednews.com/article/katienotopoulos/ancestry-com-reclaim-the-records-new-york-lawsuit (explaining that "a representative from Ancestry will reach out to a local government archive or historical society and offer to take on the costs, labor and machinery needed to scan and digitized their records" in exchange for "the [exclusive] right to put the images on their website").

archives, and historical societies. Ancestry has also accepted yearbook donations shipped to Ancestry by Illinois residents.

21.     Ancestry took intellectual property it knew belonged to Illinois residents. By obtaining and copying yearbooks from schools across the country, including thousands of Illinois schools, Ancestry willfully misappropriated the publicity rights belonging to millions of Illinois residents. Ancestry cannot credibly claim to be ignorant that that many of the names and likenesses in its database belonged to Illinois residents.

22.     Ancestry regularly advertises specifically to Illinois residents, in addition to its advertisements directed countrywide. Although Plaintiffs do not know all advertisements Ancestry has directed to Illinois and believes discovery will reveal more, the investigation to date has revealed the following:

23.  <u>Newspaper Advertisements in Local Illinois Newspapers</u>. Ancestry has advertised its subscription product, which is the subject of this lawsuit, in many Illinois newspapers of exclusively local circulation. Examples include the following full-page spread published in the Decatur Herald and Review on July 4, 2010:



… and the following advertisement published in the Chicago Tribune on March 9, 2012:



24.     <u>Partnerships with Illinois Libraries and Civic Centers</u>. Ancestry regularly promotes its subscription product by offering limited free access to Illinois residents at Illinois libraries. For example, Ancestry is now offering a limited version of its product for free at the Romeoville branch of the White Oak Library District in Romeoville, Illinois, and at the Moline Public Library.[2] Ancestry also sponsors educational sessions and seminars about Ancestry.com and genealogical research at Illinois libraries and civic centers. For example, the Glenview Public Library hosted an "Introduction to Ancestry.com" on March 25, 2021, and Ancestry sponsored a family history writing seminar at a civic center in Davenport, Illinois in March 2012.[3]

25.     <u>Video Advertisement About an Ancestry User from Chicago</u>. As part of a promotional campaign highlighting user experiences, Ancestry produced and distributed a video highlighting the story of a Chicago woman who used Ancestry.com to connect with her cousin and open a restaurant in the Hyde Park neighborhood of Chicago. The video clearly displays a census record from Chicago, Illinois.[4] On their website, Ancestry describes the subject of the video as a "caterer . . . (Chicago)" who is "opening up a soul food restaurant in Chicago's Hyde Park."[5]

26.     Ancestry misappropriated the class members' names and likenesses for the express purpose of advertising and selling Ancestry.com subscriptions to their relatives, who Ancestry new

---

[2] https://patch.com/illinois/romeoville/library-members-can-now-have-virtual-access-ancestry; https://www.molinelibrary.com/386/Ancestrycom-Library-Edition
[3] https://www.chicagotribune.com/entertainment/things-to-do/ct-things-to-do-in-chicago-htmlstory.html?_escaped_fragment_=/show/?start=2019-10-23#!/details/Introduction-to-Ancestry-com/8851738/2021-03-25T19; https://www.newspapers.com/image/436365907
[4] https://www.ancestry.com/corporate/blog/ancestrycom-launches-my-story-advertising-campaign
[5] https://www.ancestry.com/corporate/blog/ancestrycom-launches-my-story-advertising-campaign

were likely to be Illinois residents. Ancestry.com encourages visitors to use the Ancestry Yearbook Database to "[f]ind out what your relatives were really like in high school and college." And Ancestry's statements to investors highlight the advertising value of features like "record hinting," an Ancestry advertising technique that entices non-paying users to become paying subscribers by promising access to records about family members.[6] By its own description, Ancestry's purpose for acquiring class members' names and photographs is to maximize the chance their relatives will buy Ancestry.com subscriptions.

27.     Ancestry knows, or should have known, that the relatives of people who went to school in Illinois are likely to themselves be Illinois residents, as are the relatives of people who went to school in states near Illinois. Research by the Pew Research Center shows that more than 40% of adults in the U.S. live "in or near the community where they grew up."[7]

28.     Ancestry's efforts to sell its product to Illinois residents have been successful. Ancestry reports over three million paying subscribers. Upon information and belief, tens if not hundreds of thousands of those subscribers are Illinois residents.

29.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b). A substantial portion of the events and conduct giving rise to the violations alleged in this complaint occurred in this district.

---

[6] *See* Form 10-Q filed June 30, 2016 by Ancestry.com LLC ("Our conversion marketing efforts are focused on converting registered users to paying subscribers through on-site messaging, email, targeted offers and compelling product features like record hinting."). Available at https://www.sec.gov/Archives/edgar/data/1575319/000157531916000041/ acom2016063010-q.htm#s77FC53301E940CD0A1BDD6FC46C1ABAC.

[7] "Key Findings about American life in urban, suburban and rural areas", Kristen Bialik, May 22, 2018, at https://www.pewresearch.org/fact-tank/2018/05/22/key-findings-about-american-life-in-urban-suburban-and-rural-areas/.

A substantial portion of the class members reside in this state and district. Named Plaintiff Sergio Bonilla resides in this district.

## INTRADISTRICT VENUE

30.     Venue in this Division of the District is proper because a substantial part of the events or omissions which give rise to the claim occurred in this division. Plaintiff Sergio Bonilla resides in Lake County.

## PARTIES

**Defendant Ancestry**

31.     Defendant ANCESTRY.COM OPERATIONS INC. is a Virginia corporation with its headquarters in Lehi, Utah. It conducts business under the brand names "Ancestry.com," "Ancestry," and other brand names associated with the various website and services it owns and operates. Ancestry conducts business throughout this District, Illinois, and the United States. Ancestry owns and operates the website Ancestry.com.

32.     Defendant ANCESTRY.COM INC. is a Delaware corporation with its headquarters in Lehi, Utah. Defendant ANCESTRY.COM LLC is a Delaware limited liability company with its headquarters in Lehi, Utah.

33.     There are many related corporate entities associated with the Ancestry.com website. Plaintiffs are ignorant of which additional related corporate entities were involved in the wrongdoing alleged herein. Plaintiffs therefore sue these Doe Defendants by fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities of these fictitiously named Doe Defendants when they are ascertained. Each of the fictitiously named Doe Defendants is responsible for the conduct alleged in this Complaint and Plaintiffs' damages were actually and proximately caused by the conduct of the fictitiously named Doe Defendants.

**Plaintiff Sergio Bonilla**

34.     Plaintiff Sergio Bonilla is a resident of Great Lakes, Illinois. Mr. Bonilla is not a subscriber of any Ancestry.com products or services and is not subject to any Terms of Service or any other agreement with Ancestry.com.

35.     Sergio Bonilla has not provided consent to Ancestry, written or otherwise, for the use of his name, photograph, or likeness.

36.     Ancestry has never notified, requested consent, or provided compensation to Sergio Bonilla for its appropriation of his identity, photograph, image, and likeness. Mr. Bonilla first became aware that his personal information and photographs are being used by Ancestry through the investigation of this lawsuit.

37.     Ancestry has and continues to use Sergio Bonilla's identity, including his name, photograph, image, and likeness, for a commercial purpose by selling access to his identity in its products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans. Subscribers who pay monthly subscriptions fees of between $24.99 and $49.99 per month, depending on the plan, receive in exchange the ability to search for, view, and download records in Ancestry's Yearbook Database. This database includes a record corresponding to Mr. Bonilla from a 1995 yearbook from Central High School in Omaha, Nebraska, where Mr. Bonilla attended school. Paying subscribers may search for Mr. Bonilla and view and download the record, which contains his identity, name, photograph, image, and likeness.

38.     There is no indication in the Central High School yearbook that the authors intended the content to be published or otherwise distributed online. Upon information and belief, Ancestry has not attempted to contact the authors of either yearbook, nor has Ancestry received any indication the authors intended the content to be published or otherwise distributed online.

13

39.     Upon information and belief, Ancestry does not hold copyright in the Central High School yearbook, nor has it made any attempt to identify the copyright holders and obtain copyright.

40.     Ancestry has and continues to use Mr. Bonilla's identity, including his name, photograph, image, and likeness, for the commercial purpose of advertising and promoting the purchase of its subscription services and products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans, by using Mr. Bonilla's identity in its 14-day promotional "free trial." Users of the promotional "free trial" may search for, download, and view records in Ancestry's Yearbook Database. "Free trial" users receive access to the same record corresponding to Mr. Bonilla that is available to paying users. Ancestry's sole purpose in using Mr. Bonilla's name, photograph, and likeness in the promotional "free trial" version of its website is to advertise, sell, and solicit the purchase of paid subscription plans.

41.     A screenshot showing the results of a search for Sergio Bonilla's name on Ancestry.com is shown below, followed by two screenshots showing the more detailed versions of the record that are delivered if the user clicks the "View Record" and "View" links visible on the page. These pages are accessible both to paying subscribers and to users of Ancestry's promotional 14-day "free trial." Plaintiff's counsel used photo-editing software to blur Mr. Bonilla's face and the names and faces of the four other boys who appear next to Mr. Bonilla. In the original record Ancestry created and is currently using, Mr. Bonilla's face is plainly visible, as are the faces of the four other boys in the photograph, all of whom are aged between 9 and 12 years old at the time of the photograph.





42.     The record corresponding to Sergio Bonilla uniquely identifies Sergio Bonilla. It plainly and conspicuously displays Mr. Bonilla's name, image, photograph, estimated age, school, city of residence, and the date of the yearbook in which the photo appears. Mr. Bonilla's face is plainly visible. The record identifies his participation in the Boy's Swim Team.

43.     Ancestry has and continues to use Mr. Bonilla's identity, including his name, photograph, image, and likeness, for the commercial purpose of advertising, selling, and soliciting the purchase of its subscription services and products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans, by using Mr. Bonilla's identity in the promotional limited-access version of its website. Any visitor to the Ancestry website may access the promotional limited-access version, even if they have not provided contact information or signed up for the promotional "free trial." Users of the promotional limited-access version of the website may search for records in Ancestry's Yearbook and may view a limited portion of the information in those records, including the name, city of residence, and a low-resolution version of the photograph corresponding to each record. Users of the promotional limited-access version of the Ancestry website receive access to a limited version of same record corresponding to Mr. Bonilla that is available to paying users.

44.     Ancestry's sole purpose in using Sergio Bonilla's identity, including his name, photograph, image, and likeness, in the promotional limited-access version of its website is to advertise, sell, and solicit the purchase of paid subscription plans. Users who search for Sergio Bonilla's name are shown a limited version of the record corresponding to Mr. Bonilla, which includes Mr. Bonilla's name, city of residence, and a low-resolution version of Mr. Bonilla's photograph.  Users who hover over the "View Record" link corresponding to the record receive a

promotional pop-up advertisement from Ancestry displaying Mr. Bonilla's name, a low-resolution version of his photograph, and a message indicating "There's more to see" and promising the user access to Mr. Bonilla's estimated age, birth year, school, yearbook date, school location, and a full-resolution of Mr. Bonilla's photograph if they "Sign Up Now" for a paid subscription.

45.　　A screenshot showing the results of a search for Sergio Bonilla's name on the promotional limited-access version of the Ancestry website is shown below, followed by a screenshot showing the promotional pop-up advertisement Ancestry delivers to users who hover over the "View Record" link corresponding to the record.





46.     As one of its advertising techniques, Ancestry regularly sends promotional emails to users who have signed up for a free account with Ancestry but have not yet become paying users. Some of those promotional emails contain "hints" corresponding to yearbook records of people Ancestry believes the recipient may be related to. The "hint" emails display the full name and estimated birth year of the individual. Clicking on either the individual's name or on the button labelled "See your hint" brings the recipient directly to a web page soliciting a six-month subscription to Ancestry.com for $99.00.

47.     Because Ancestry.com extracted his yearbook photographs without permission, Mr. Bonilla's name and likeness is now part of the database from which Ancestry populates the "hint" emails it sends soliciting payment for Ancestry.com services. The screenshot below illustrates the use of a name and likeness in a "hint" email Ancestry.com sent to a non-paying Ancestry account Plaintiffs' counsel established as part of their investigation.



48.     After clicking on the name "Geoffrey Abraham" or the "See your hint" button, the recipient is brought to the following webpage soliciting a six-month subscription to Ancestry.com for $99.00:



49.     Ancestry has sent and continues to send many thousands of such "hint" emails populated with the names and likenesses of Illinois residents who are members of the class.

50.     Mr. Bonilla has a property interest in his likeness recognized by Illinois statutory law. He has the "right to control and to choose whether how to use [their] identity for commercial purposes." 765 ILCS 1075/10. The right is not limited to celebrities, nor is it restricted to those who have developed the commercial value of their likenesses. By using his likeness for profit without permission, Ancestry violated Mr. Bonilla's property interest and denied him the right to

21

control guaranteed under Illinois law. The violation of these property rights is a recognized form of injury.

51.     By using class members' likenesses for profit without their permission, Ancestry created a right for Mr. Bonilla in the unjust profit Ancestry has earned from their likeness. Illinois statutory law recognizes an individual's right to "profits derived from the unauthorized use." 765 ILCS 1075/40. By using Mr. Bonilla's likenesses for profit without his permission, Ancestry created his right to the "profits [Ancestry has] derived" from its use of his likeness. Ancestry does Mr. Bonilla continuing injury ever day it denies him the profits it has unjustly derived from his likeness.

52.     Ancestry has also injured Mr. Bonilla by violating his privacy rights protected by statute and common law. The violation of such a right is itself injury, and creates an entitlement to injunctive relief, nominal damages, and statutory damages.

**Plaintiff Joshua Braundmeier**

53.     Plaintiff Joshua Braundmeier is a resident of Springfield, Illinois. Mr. Braundmeier is not a subscriber of any Ancestry products or services. Mr. Braundmeier is not subject to any Terms of Service or other agreement with Ancestry. After Plaintiffs' counsel shared Mr. Braundmeier's name and email addresses with Ancestry's counsel, Ancestry's counsel confirmed that Ancestry was "unable to locate any accounts registered under [his] name[]." Ex. 1.

54.     Mr. Braundmeier has never provided consent to Ancestry, written or otherwise, for its use of his name, photograph, and identity.

55.     Ancestry has never notified, requested consent from, or provided compensation to Mr. Braundmeier for its appropriation of his name, photograph, and identity.

56.     There is no agreement to arbitrate between Mr. Braundmeier and Ancestry. At no time has Mr. Braundmeier believed any agreement between himself and Ancestry exists or existed.

57.     Mr. Braundmeier hereby expressly repudiates any agreement to arbitrate that Ancestry may contend exists or existed.

58.     Mr. Braundmeier instructed his attorneys to pursue a claim against Ancestry in federal court. Mr. Braundmeier has never authorized, and does not authorize, his attorneys to agree to arbitration on his behalf.

59.     Mr. Braundmeier is not aware of any agreements between his attorneys and Ancestry.

60.     Mr. Braundmeier is not aware of any accounts on Ancestry.com created by his attorneys.

61.     Mr. Braundmeier did not instruct or authorize his attorneys to investigate the Ancestry.com website. Mr. Braudmeier did not instruct or authorize his attorneys to create an account on Ancestry.com or agree to a Terms of Service.

62.     By willingly litigating this action in federal Court for nearly two years, Ancestry has waived the right to assert Mr. Braundmeier must arbitrate his claim. Mr. Braundmeier is a member of the putative class on behalf of which Mr. Bonilla filed his initial complaint in this action on December 14, 2020. Ancestry has litigated this putative class action for nearly two years without asserting this action should be pursued in an arbitral forum. Over a year ago, on April 9, 2021, Ancestry filed a motion to dismiss Mr. Bonilla's class claims in which it asserted this Court lacked personal jurisdiction. That motion failed to mention any purported agreement to arbitrate between Ancestry and Mr. Bonilla, or between Ancestry and any member of the class, including Mr. Braundmeier.

63.     None of the allegations in this Complaint relating to Ancestry's use of Mr. Braundmeier's photograph are based on any information gathered from Ancestry.com. Instead, Mr. Braundmeier's allegations are based on information Ancestry's counsel provided to Plaintiffs' counsel. In an e-mail dated July 27, 2022, Ancestry's counsel confirmed that Mr. Braundmeier's photograph became part of Ancestry's Yearbook Database on August 16, 2021. Ex. 1. Mr. Braundmeier's allegations below relating to Ancestry's use of his photograph to advertise website subscriptions are based on this admission by Ancestry via its counsel. The allegations do not rely on any information gathered by Plaintiffs' counsel from the Ancestry.com website, other than the screenshots that became part of the public record when Mr. Bonilla filed the initial Complaint on December 14, 2020.

64.     Mr. Braundmeier highly values his personal privacy and the ability to control and prevent the commercial use of his likeness without consent.

65.     Ancestry uses Mr. Braundmeier's yearbook photograph as a minor child in advertisements promoting website subscriptions. Ancestry possesses at least one photograph of Mr. Braundmeier it uses for this purpose, which it appropriated without his permission from his yearbook from Gillespie Community High School. *See* Ex. 1 (communication from Ancestry's counsel admitting photographs from Mr. Braundmeier's yearbook are searchable on Ancestry.com).

66.     Ancestry incorporates Mr. Braundmeier's photograph in advertisements for website subscriptions in the same way it incorporates Mr. Bonilla's and Mr. Abraham's photographs. *See* ¶¶37-49 *above*. This allegation, and the succeeding allegations related to Ancestry's use of Mr. Braundmeier's photograph, are not based on direct observation of the

Ancestry.com website. Instead, these allegations are based on Plaintiffs' knowledge that Ancestry incorporates all yearbook photographs in its database into advertisements in the same way.

67.     Ancestry provides a publicly accessible webpage on which non-subscribers may search for Mr. Braundmeier by name and location.

68.     Non-subscribers who search for Mr. Braundmeier receive in response a list of yearbook photographs in the Ancestry database that depict Mr. Braundmeier as a child. *See* ¶45 above.

69.     Ancestry displays a promotional pop-up to non-subscribers that shows a low-resolution version of Mr. Braundmeier's childhood photograph. *See* ¶45 above. The pop-up advertises that with a paid subscription, the non-subscriber would gain access to "A [higher resolution] picture of the original document" showing the subject's photograph. Id.

70.     The pop-up also shows the categories of personal information about Mr. Braundmeier to which the non-subscriber would gain access with a paid subscription. *See* ¶45 above. The pop-up advertises that with a paid subscription, the non-subscriber would learn the subject's "estimated age," "birth year," and "school location," among other information.

71.     The pop-up prominently displays Mr. Braundmeier's name. *See* ¶45 (showing pop-up titled "NAME: Sergio Bonilla"; the pop-up Ancestry publishes for Mr. Braundmeier displays his name in the same manner). The pop-up promises that "There's more to see" about Mr. Braundmeier and prompts the non-subscriber to "Sign Up Now" to learn more about Mr. Braundmeier. *Id*.

72.     After the non-subscriber clicks "Sign Up Now" on the pop-up, or clicks on any of the blue hyperlinks on the search result page, see ¶45, Ancestry displays a payment page soliciting the purchase of a subscription plan at a cost of $99 for six months or $24.99 per month. *See* ¶48.

73.     Mr. Braundmeier's childhood photograph is part of the database from which Ancestry populates "hint" emails soliciting paid subscriptions. The appearance and format of a "hint" email is shown in ¶47 above.

74.     On information and belief, Ancestry has sent "hint" emails containing Mr. Braundmeier's name and childhood photograph.

75.     As alleged and shown above, Ancestry uses Mr. Braundmeier's name, childhood photograph, personal information, and identity in advertisements it displays publicly on the Internet for the commercial purpose of soliciting subscriptions. Ancestry also uses Mr. Braundmeier's name and identity in promotional "hint" emails for the commercial purpose of soliciting subscriptions.

76.     Mr. Braundmeier does not know how Ancestry obtained his photograph. It appears to have been misappropriated from his high school yearbook.

77.     On information and belief, Ancestry received no indication, and had no reasonable belief, that the people who created Mr. Braundmeier's yearbook intended the yearbook to be published on the Internet or used to promote website subscriptions.

78.     On information and belief, Ancestry did not obtain permission from the yearbook's authors, the photographer who took Mr. Braundmeier's photograph, or the yearbook's copyright holder prior to incorporating Mr. Braundmeier's photograph and other photographs from the yearbook in advertisements. Ancestry does not own the copyright in Mr. Braundmeier's yearbook or his photograph.

79.     Mr. Braundmeier has intellectual property and privacy interests in his name, likeness, and identity recognized by Illinois statutory law. He has the right to exclude anyone from making commercial use of his identity without his consent.

80.     Ancestry has injured Mr. Braundmeier by profiting from its use of his name and identity without compensating him; by misappropriating and infringing his intellectual property rights without compensation; by violating his statutorily protected right to control the commercial use of his name and likeness; and by disturbing his peace of mind.

81.     Mr. Braundmeier is indignant and disgusted by Ancestry's violation of his privacy and intellectual property while profiting from the illegal use of his photos as a minor. Mr. Braundmeier is deeply disturbed by Ancestry's use of his name and photograph without his consent. He believes his identity is rightly his to control. Ancestry's illegal use has left him worried about his inability to control how his name and identity is used. Mr. Braundmeier feels that Classmates' use of his photograph and personal information represents an alarming invasion of his privacy and intellectual property, and renders him vulnerable to identity theft.

**Plaintiff Kevin Wallace**

82.     Plaintiff Kevin Wallace is a resident of Normal, Illinois. Mr. Wallace is not a subscriber of any Ancestry products or services. Mr. Wallace is not subject to any Terms of Service or other agreement with Ancestry. After Plaintiffs' counsel shared Mr. Wallace's name and email addresses with Ancestry's counsel, Ancestry's counsel confirmed that Ancestry was "unable to locate any accounts registered under [his] name[]." Ex. 1.

83.     Mr. Wallace has never provided consent to Ancestry, written or otherwise, for its use of his name, photograph, and identity.

84.     Ancestry has never notified, requested consent from, or provided compensation to Mr. Wallace for its appropriation of his name, photograph, and identity.

85.     There is no agreement to arbitrate between Mr. Wallace and Ancestry. At no time has Mr. Wallace believed any agreement between himself and Ancestry exists or existed.

86.     Mr. Wallace hereby expressly repudiates any agreement to arbitrate that Ancestry may contend exists or existed.

87.     Mr. Wallace instructed his attorneys to pursue a claim against Ancestry in federal court. Mr. Wallace has never authorized, and does not authorize, his attorneys to agree to arbitration on his behalf.

88.     Mr. Wallace is not aware of any agreements between his attorneys and Ancestry.

89.     Mr. Wallace is not aware of any accounts on Ancestry.com created by his attorneys.

90.     Mr. Wallace did not instruct or authorize his attorneys to investigate the Ancestry.com website. Mr. Wallace did not instruct or authorize his attorneys to create an account on Ancestry.com or agree to a Terms of Service.

91.     By willingly litigating this action in federal Court for nearly two years, Ancestry has waived the right to assert Mr. Wallace must arbitrate his claim. Mr. Wallace is a member of the putative class on behalf of which Mr. Bonilla filed his initial complaint in this action on December 14, 2020. Ancestry has litigated this putative class action for nearly two years without asserting this action should be pursued in an arbitral forum. Over a year ago, on April 9, 2021, Ancestry filed a motion to dismiss Mr. Bonilla's class claims in which it asserted this Court lacked personal jurisdiction. That motion failed to mention any purported agreement to arbitrate between Ancestry and Mr. Bonilla, or between Ancestry and any member of the class, including Mr. Wallace.

92.     None of the allegations in this Complaint relating to Ancestry's use of Mr. Wallace's photograph are based on any information gathered from Ancestry.com. Instead, Mr. Wallace's allegations are based on information Ancestry's counsel provided to Plaintiffs' counsel. In an e-mail dated July 27, 2022, Ancestry's counsel confirmed that Mr. Wallace's photograph

became part of Ancestry's Yearbook Database on August 16, 2021. Ex. 1. Mr. Wallace's allegations below relating to Ancestry's use of his photograph to advertise website subscriptions are based on this admission by Ancestry via its counsel. The allegations do not rely on any information gathered by Plaintiffs' counsel from the Ancestry.com website, other than the screenshots that became part of the public record when Mr. Bonilla filed the initial Complaint on December 14, 2020.

93.      Mr. Wallace highly values his personal privacy and the ability to control and prevent the commercial use of his likeness without consent.

94.      Ancestry uses Mr. Wallace's yearbook photograph as a minor child in advertisements promoting website subscriptions. Ancestry possesses at least one photograph of Mr. Wallace it uses for this purpose, which it appropriated without his permission from his yearbook from Gillespie Community High School. *See* Ex. 1 (communication from Ancestry's counsel admitting photographs from Mr. Wallace's yearbook are searchable on Ancestry.com).

95.      Ancestry incorporates Mr. Wallace's photograph in advertisements for website subscriptions in the same way it incorporates Mr. Bonilla's and Mr. Abraham's photographs. *See* ¶¶37-49 *above*. This allegation, and the succeeding allegations related to Ancestry's use of Mr. Wallace's photograph, are not based on direct observation of the Ancestry.com website. Instead, these allegations are based on Plaintiffs' knowledge that Ancestry incorporates all yearbook photographs in its database into advertisements in the same way.

96.      Ancestry provides a publicly accessible webpage on which non-subscribers may search for Mr. Wallace by name and location.

97.      Non-subscribers who search for Mr. Wallace receive in response a list of yearbook photographs in the Ancestry database that depict Mr. Wallace as a child. *See* ¶45 above.

98.     Ancestry displays a promotional pop-up to non-subscribers that shows a low-resolution version of Mr. Wallace's childhood photograph. *See* ¶45 *above*. The pop-up advertises that with a paid subscription, the non-subscriber would gain access to "A [higher resolution] picture of the original document" showing the subject's photograph. *Id*.

99.     The pop-up also shows the categories of personal information about Mr. Wallace to which the non-subscriber would gain access with a paid subscription. *See* ¶45 *above*. The pop-up advertises that with a paid subscription, the non-subscriber would learn the subject's "estimated age," "birth year," and "school location," among other information.

100.    The pop-up prominently displays Mr. Wallace's name. *See* ¶45 (showing pop-up titled "NAME: Sergio Bonilla"; the pop-up Ancestry publishes for Mr. Wallace displays his name in the same manner). The pop-up promises that "There's more to see" about Mr. Wallace and prompts the non-subscriber to "Sign Up Now" to learn more about Mr. Wallace. *Id*.

101.    After the non-subscriber clicks "Sign Up Now" on the pop-up, or clicks on any of the blue hyperlinks on the search result page, *see* ¶45, Ancestry displays a payment page soliciting the purchase of a subscription plan at a cost of $99 for six months or $24.99 per month. *See* ¶48.

102.    Mr. Wallace's childhood photograph is part of the database from which Ancestry populates "hint" emails soliciting paid subscriptions. The appearance and format of a "hint" email is shown in ¶47 above.

103.    On information and belief, Ancestry has sent "hint" emails containing Mr. Wallace's name and childhood photograph.

104.    As alleged and shown above, Ancestry uses Mr. Wallace's name, childhood photograph, personal information, and identity in advertisements it displays publicly on the Internet for the commercial purpose of soliciting subscriptions. Ancestry also uses Mr. Wallace's

name and identity in promotional "hint" emails for the commercial purpose of soliciting subscriptions.

105.     Mr. Wallace does not know how Ancestry obtained his photograph. It appears to have been misappropriated from his high school yearbook.

106.     On information and belief, Ancestry received no indication, and had no reasonable belief, that the people who created Mr. Wallace's yearbook intended the yearbook to be published on the Internet or used to promote website subscriptions.

107.     On information and belief, Ancestry did not obtain permission from the yearbook's authors, the photographer who took Mr. Wallace's photograph, or the yearbook's copyright holder prior to incorporating Mr. Wallace's photograph and other photographs from the yearbook in advertisements. Ancestry does not own the copyright in Mr. Wallace's yearbook or his photograph.

108.     Mr. Wallace has intellectual property and privacy interests in his name, likeness, and identity recognized by Illinois statutory law. He has the right to exclude anyone from making commercial use of his identity without his consent.

109.     Ancestry has injured Mr. Wallace by profiting from its use of his name and identity without compensating him; by misappropriating and infringing his intellectual property rights without compensation; by violating his statutorily protected right to control the commercial use of his name and likeness; and by disturbing his peace of mind.

110.     Mr. Wallace is indignant and disgusted by Ancestry's violation of his privacy and intellectual property while profiting from the illegal use of his photos as a minor. Mr. Wallace is deeply disturbed by Ancestry's use of his name and photograph without his consent. He believes his identity is rightly his to control. Ancestry's illegal use has left him worried about his inability to control how his name and identity is used. Mr. Wallace feels that Classmates' use of his

photograph and personal information represents an alarming invasion of his privacy and intellectual property, and renders him vulnerable to identity theft.

## STATEMENT OF COMMON FACTS

111.    Ancestry's business model is based on gathering personal information from various sources, then selling access to that information for a monthly subscription fee. Ancestry uses the personal information it has amassed to advertise, sell, and solicit the purchase of its subscription products and services. Sources from which Ancestry.com collects personal information include school yearbooks, birth records, marriage records, death records, U.S. census records, immigration records, military records, and photographs of grave sites.

112.    As part of this business model, Ancestry amassed and continues to grow its "Ancestry Yearbook Database", which contains names, yearbook photos, estimated ages, schools attended, and additional personal information extracted from school yearbooks. Ancestry aggregates the extracted information into digital records associated with specific individuals. The Ancestry Yearbook Database comprises about 730 million individual records collected from "more than 450,000 yearbooks and more than 62 million pages." Of those 730 million records, about 47 million are marked in the database as corresponding to students in Illinois schools.

113.    Each record in the Ancestry Yearbook Database includes at least the following information: the name of a specific individual; a photograph depicting that individual; the name of the school the individual attended; the year in which the yearbook was printed; and the city in which that individual lived. Some records contain additional personal information, including the individual's estimated age at the time of the photograph, estimated year of birth, and hobbies and interests while in school.

114.    Ancestry did not and does not seek consent from, give notice to, or provide compensation to Plaintiffs and the class before placing their personal information in its Ancestry Yearbook Database, selling that information as part of its subscription products, and using that information to sell, advertise, and solicit the purchase of its subscription products.

115.    Upon information and belief, Ancestry does not take any steps to determine whether the authors of the yearbooks that are the source of raw material in its Yearbook Database intended their content for publication online. Many of the yearbooks were published well before the Internet was widely used.

116.    Upon information and belief, Ancestry does not take any steps to acquire copyright in the yearbooks that are the source of raw material in its Yearbook Database.

117.    Ancestry makes no attempt to contact or gain the consent of any of the people whose names, photographs, likenesses, biographical information, and identities appear in a donated yearbook. Ancestry is apparently alert to the risks its business model runs under copyright law, but it does not even attempt to meet its obligations under the Illinois right to publicity. Ancestry asks yearbook donors to sign a disclaimer that the donated yearbook is either "not bound by copyright restrictions" or "the copyright is held by the donor." But Ancestry does not require or even suggest the donor should ask the consent of the people who appear in the yearbook to have their names, photographs, and images added to the Ancestry Yearbook Database.

118.    Each record in the Ancestry Yearbook Database uniquely identifies an individual human being. Indeed, the fact these records uniquely identify specific individuals is the primary selling point Ancestry uses to attract new subscribers. In its online promotional materials, Ancestry touts that subscribers will gain access to the records in its Ancestry Yearbook Database, each of which "Pinpoints an individual in a particular time and place" by joining information about the

33

person including name, "school or town," time, "a photo," "interests and hobbies," and "family linkages" because siblings may appear in the same yearbook.

119.     Ancestry has and continues to use the identities of Plaintiffs and the class, including their names, photographs, images, and likenesses, for a commercial purpose by selling access to their identities in its products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans. Subscribers who pay monthly subscriptions fees of between $24.99 and $49.99 per month, depending on the plan, receive in exchange the ability to search for, view, and download records in Ancestry's Yearbook Database. Paying subscribers may view and download records containing the names, photographs, and likenesses of Plaintiffs and the class.

120.     Ancestry has and continues to use the identities of Plaintiffs and the class, including their names, photographs, images, and likenesses, for the commercial purpose of advertising and promoting its subscription services and products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans, by using the identities of Plaintiffs and the class in its 14-day promotional "free trial." Users of the promotional "free trial" may search for, download, and view records in Ancestry's Yearbook Database. "Free trial" users receive access to the same records that are available to paying users. Ancestry's sole purpose in using the names, photographs, images, and likenesses of Plaintiffs and the class in the promotional "free trial" version of its website is to advertise and promote its paid subscription plans.

121.     Ancestry has and continues to use the identities of Plaintiffs and the class, including their names, photographs, images, and likenesses, for the commercial purpose of advertising and promoting its subscription services and products, including its "U.S. Discovery," "World Explorer," and "All Access" paid subscription plans, by using the identities of Plaintiffs and the class in the promotional limited-access version of its website. Any visitor to the Ancestry website may access

the promotional limited-access version, even if they have not provided contact information or signed up for the promotional "free trial." Users of the promotional limited-access version of the website may search for records in Ancestry's Yearbook and may view a limited portion of the information in those records, including the name, city of residence, and a low-resolution version of the photograph corresponding to each record. Users of the promotional limited-access version of the Ancestry website receive access to a limited version of same records that are available to paying users.

122.    Ancestry's sole purpose in using the names, photographs, images, and likenesses of Plaintiffs and the class in the promotional limited-access version of its website is to advertise and promote its paid subscription plans. Users may access limited versions of the records Ancestry has amassed corresponding to Plaintiffs and the class. The limited-version records include a name, city of residence, and a low-resolution version of a photograph portraying the class member. Users who hover over the "View Record" link corresponding to each record receive a promotional pop-up advertisement from Ancestry displaying the class member's name, a low-resolution version of the photograph, and a message indicating "There's more to see" and promising the user access to the class member's estimated age, birth year, school, yearbook date, school location, and a full-resolution of the class member's photograph if they "Sign Up Now" for a paid subscription.

123.    Ancestry derives measurable economic value from its use of yearbook records in on-site messages designed to convert visitors into paying subscribers. In public statements to investors, Ancestry has recognized that its ability to attract and retain subscribers depends on amassing the largest possible database of photographs and other personal information with which to populate on-site messages. "In order to retain and expand our subscriber base. . . we must continue to expend significant resources to acquire significant amounts of additional historical

content, digitize it and make it available to our subscribers online. . . Our inability to offer certain vital records or other valuable content as part of our family history research databases. . . could have a material adverse impact on our number of subscribers."[8]

124.    That Ancestry derives and ascribes measurable economic value to Plaintiffs' and class members' yearbook photographs is further demonstrated by the fact that Ancestry pays licensing and other fees to PeopleConnect, Inc., in exchange for digitized copies of the photographs and the purported right to make commercial use of those photographs.

125.    Ancestry has and continues to knowingly use the names, biographical information, and likenesses of Plaintiffs and the class in promotional "hint" emails it sends to users who have signed up for a free account with Ancestry but have not yet become paying users. The "hint" emails contain links to yearbook records of people Ancestry believes the recipient may be related to. The "hint" emails display the full name and estimated birth year of the individual. Clicking on either the individual's name or on the button labelled "See your hint" brings the recipient directly to a web page soliciting a six-month subscription to Ancestry.com for $99.00.

126.    Ancestry derives measurable economic value from its use of "hint" emails containing class members' names and likenesses. In public statements to investors, Ancestry has specifically recognized the value "hint" emails play in converting non-paying users to registered subscribers. "Our conversion marketing efforts are focused on converting registered users to paying subscribers through on-site messaging, *email*, targeted offers and *compelling product*

---

[8] Available at https://www.sec.gov/Archives/edgar/data/1575319/000157531916000041/ acom2016063010-q.htm#s77FC53301E940CD0A1BDD6FC46C1ABAC.

*features like record hinting*." Form 10-Q filed June 30, 2016 by Ancestry.com LLC (emphasis added).[9]

127.    The vast majority of people whose personal information Ancestry has amassed in its Ancestry Yearbook Database have no business relationship with Ancestry, are not Ancestry subscribers, and are not subject to a Terms of Service or any other agreement with Ancestry.

128.    Illinois residents have a property interest in their likenesses recognized by Illinois statutory law. They have the "right to control and to choose whether how to use [their] identity for commercial purposes." 765 ILCS 1075/10. The right is not limited to celebrities, nor is it restricted to those who have developed the commercial value of their likenesses. By using class members' likenesses for profit without their permission, Ancestry violated their property interest and denied them the right to control guaranteed under Illinois law. The violation of these property rights is a recognized form of injury.

129.    By using class members' likenesses for profit without their permission, Ancestry created a right for each class member in the unjust profit Ancestry has earned from their likeness. Illinois statutory law recognizes an individual's right to "profits derived from the unauthorized use."  765 ILCS 1075/40. By using class members' likenesses for profit without their permission, Ancestry created a right for each class member in the "profits [Ancestry has] derived" from its use of their likeness.

130.    Ancestry has also injured the class by violating their privacy and intellectual property rights protected by statute and common law. The violation of such a right is itself injury,

---

[9] *Supra* n. 1.

and creates in the class members an entitlement to injunctive relief, nominal damages, and statutory damages.

131.    Ancestry's misappropriation of identities, including names, photographs, images, likenesses, and other personal information, and commercial use of those identities in selling and advertising its products and services, violate Illinois' statute protecting the right to publicity, 765 ILCS 1075/1 *et seq.*, and Illinois common law protecting against unjust enrichment.

## CLASS ALLEGATIONS

132.    Plaintiffs bring this complaint on behalf of themselves and a class of all Illinois residents who (a) are not currently subscribers of any Ancestry services, (b) have never donated a yearbook to Ancestry, and (c) whose names, photographs, and/or likenesses were extracted from yearbooks by Ancestry and placed on the Ancestry website as part of its Yearbook Database, without Ancestry obtaining their consent. Excluded from the class are (a) Plaintiffs' counsel; (b) Ancestry, its officers and directors, counsel, successors and assigns; (c) any entity in which Ancestry has a controlling interest; and (d) the judge to whom this case is assigned and the judge's immediate family.

133.    The members of the proposed class are so numerous that joinder of individual claims is impracticable. As of September 2020, Ancestry represents that its Ancestry Yearbook Database contains 730 million records. Of those, 47 million records correspond to schools in Illinois. Even accounting for the fact that some individuals have multiple records present in the database, that some are deceased or no longer reside in Illinois, and that the class excludes current Ancestry subscribers (Ancestry represents it has 3 million subscribers worldwide), the class numbers in the millions.

134. There are significant questions of fact and law common to the members of the class. These issues include:

   a. Whether Ancestry's collection of personal information about Plaintiffs and the class members, including names, yearbook photographs, yearbook years, estimated ages, cities of residence, schools attended, and interest and hobbies, in its Ancestry Yearbook Database, and selling of that information via paid subscription plans, constitute the use of individuals' identities for commercial purposes without previous written consent within the meaning of 765 ILCS 1075/1 *et seq.*;

   b. Whether Ancestry's use of personal information about Plaintiffs and the class members, including names, yearbook photographs, yearbook years, estimated ages, cities of residence, schools attended, and interests and hobbies, by offering access to that information as part of its promotional 14-day "free trial" constitutes the use of individuals' identities for commercial purposes without previous written consent within the meaning of 765 ILCS 1075/1 *et seq.*;

   c. Whether Ancestry's use of personal information about Plaintiffs and the class members, including names, yearbook photographs, and cities of residence, by offering access to that information as part of the promotional limited-access version of its website constitutes the use of individuals' identities for commercial purposes without previous written consent within the meaning of 765 ILCS 1075/1 *et seq.*;

   d. Whether Ancestry's use of personal information about Plaintiffs and the class members, including names biographical information, by including that

information in "hint" email messages to potential subscribers constitutes the use of individuals' identities for commercial purposes without previous written consent within the meaning of 765 ILCS 1075/1 *et seq.*;

e. Whether Plaintiffs and the class consented to the use of their identities, names, photographs, images, and likenesses in Ancestry products and advertisements;

f. Whether Ancestry's use of personal information about Plaintiffs and the class without consent was "willful" such that Plaintiffs and the class may be entitled to punitive damages;

g. Whether Ancestry's use of identities, names, photographs, images, and likenesses constitutes a use for non-commercial purposes such as news or public affairs within the meaning of 765 ILCS 1075/35;

h. Whether Ancestry was unjustly enriched as a result of the conduct described in this complaint; and

i. Whether class members are entitled to injunctive, declaratory and monetary relief as a result of Ancestry's conduct as described in this complaint.

135. Plaintiffs' claims are typical of those of the proposed class. Plaintiffs and all members of the proposed class have been harmed by Ancestry's misappropriation and misuse of their identifies, names, photographs, images, likenesses, and other personal information.

136. The proposed class representatives will fairly and adequately represent the proposed class. The class representatives' claims are co-extensive with those of the rest of the class, and they are represented by qualified counsel experienced in class action litigation of this nature.

137. A class action is superior to other available methods for the fair and efficient adjudication of these claims because individual joinder of the claims of all members of the

proposed class is impracticable. Many members of the class do not have the financial resources necessary to pursue this claim, and even if they did, the size of their interest in the case may not be large enough to merit the cost of pursuing the case. Individual litigation of these claims would be unduly burdensome on the courts in which individualized cases would proceed. Individual litigation would greatly increase the time and expense needed to resolve a dispute concerning Ancestry's common actions towards an entire group. Class action procedures allow for the benefits of unitary adjudication, economy of scale, and comprehensive supervision of the controversy by a single court.

138.    The proposed class action may be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Ancestry has acted on grounds generally applicable to the proposed class, such that final injunctive and declaratory relief is appropriate with respect to the class as a whole.

139.    The proposed class action may be certified pursuant to Rule 23(b)(3). Questions of law and fact common to class members predominate over questions affecting individual members, and a class action is superior to other available methods for fairly and efficiency adjudicating the controversy.

## FIRST CAUSE OF ACTION
### (765 ILCS 1075/1 *et seq.*)

140.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

141.    Illinois' statute protecting the right to publicity 765 ILCS 1075/1 *et seq.*, prohibits and provides damages for using an individual's identity for commercial purposes without having obtained previous written consent.

142.    By engaging in the forgoing acts and omissions, Ancestry used Plaintiffs' and class members' identities for commercial purposes without having obtained previous written consent.

143.    Each use of a class member's identity is a separate and distinct violation of 765 ILCS 1075/1 et seq. giving rise to damages.

144.    Plaintiffs seek nominal damages, declaratory relief, injunctive relief, and monetary damages for themselves and on behalf of each member of the proposed class as provided for in 765 ILCS 1075/1 *et seq.*, including nominal damages equal to $1 per class member, statutory damages equal to the greater of $1000 per violation, actual damages, or profits Ancestry derived from its unauthorized use; punitive damages in light of Defendants' willful violation; and the award of attorneys' fees and costs in the event Plaintiffs prevails in this action.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

145.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

146.    Plaintiffs and members of the class have conferred an unwarranted benefit on Ancestry. Ancestry's business model centers around selling subscriptions for access to personal information that rightfully belongs to Plaintiffs and members of the class. Ancestry uses the personal information it misappropriated to sell its services without consent. Each subscription sold and each advertisement sent represents an unwarranted benefit conferred by the class.

147.    Under principles of equity and good conscience, Ancestry should not be permitted to retain the benefits it gained as a result of its actions.

148.    Plaintiffs and members of the class have suffered loss as a direct result of Ancestry's conduct.

149.    Among other remedies, Plaintiffs, on their own behalf and on behalf of absent class members, seeks the imposition of a constructive trust and restitution of proceeds Ancestry received

as a result of the conduct described in this complaint, as well as an award of attorneys' fees, costs, and interest.

## PRAYER FOR RELIEF

150.    WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situation, hereby demands judgment against Defendant Ancestry as follows:

> (a) For an order certifying the proposed class and appointing Plaintiffs and their counsel to represent the class;

> (b) For a declaration that Ancestry's acts and omissions constitute a knowing misappropriation of names, likeness, photographs, and other personal information, and infringe on protected privacy rights, in violation of Illinois law;

> (c) For nominal damages awarded in recognition of Ancestry's violation of the statutory protected property and privacy rights of Plaintiffs and the class;

> (d) For preliminary and permanent injunctive relief enjoining and preventing Ancestry from continuing to operate its Ancestry website and expand its databases without appropriate safeguards to ensure people's personal information is not used illegally without their consent;

> (e) For an order enjoining Ancestry from continuing the unlawful and unfair conduct described in this complaint;

> (f) For restitution for Plaintiffs and members the class for the value that Defendant derived from misappropriating their likenesses;

> (g) For an award of damages, including without limitation damages for actual harm, profits earned by Ancestry in the operation of its websites selling access to misappropriated personal information, and statutory damages;

43

(h) For an award of reasonable attorneys' fees and costs incurred by Plaintiffs and the class members; and

(i) For an award of other relief in law and equity to which Plaintiffs and the class members may be entitled.

## JURY TRIAL DEMAND

Plaintiffs hereby demands a jury trial for all individual and Class claims so triable.

Respectfully submitted,

Dated: August 24, 2022

By: */s/ Samuel J. Strauss*

Samuel J. Strauss
Email: sam@turkestrauss.com
Raina Borelli
Email: raina@turkestrauss.com
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile:  (608) 509-4423

Benjamin R. Osborn (*Pro Hac*)
102 Bergen St. Brooklyn, NY 11201
Telephone: (347) 645-0464
ben@benosbornlaw.com

Michael F. Ram (*Pro Hac*)
mram@forthepeople.com
Marie N. Appel (*Pro Hac*)
mappel@forthepeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6923

*Attorneys for Plaintiffs and the proposed class*

## **CERTIFICATE OF SERVICE**

I, Samuel J. Strauss, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 24th day of August, 2022.

TURKE & STRAUSS LLP

By: _/s/ Samuel J. Strauss_
Samuel J. Strauss
Email: sam@turkestrauss.com
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423